1  MARK F. HAZELWOOD, # 136521
   LAURA S. FLYNN, # 148511
2  LOW, BALL & LYNCH
   505 Montgomery Street, 7th Floor
3  San Francisco, California  94111-2584
   Telephone: (415) 981-6630
4  Facsimile: (415) 982-1634

5  Attorneys for Defendant
   BAY AREA RAPID TRANSIT DISTRICT

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11  PATRICIA NASH,                        )   NO. C 05 5307 VRW
                                          )
12                 Plaintiff,             )
                                          )   **DECLARATION OF MARK F.**
13       vs.                              )   **HAZELWOOD IN SUPPORT OF**
                                          )   **DEFENDANT'S MOTION FOR**
14  BAY AREA RAPID TRANSIT DISTRICT, DOES )   **SUMMARY JUDGMENT, OR**
    1- 40,                                )   **ALTERNATIVELY, PARTIAL**
15                                        )   **SUMMARY JUDGMENT**
                   Defendants.            )
16  _____)

17       I, Mark F. Hazelwood, declare as follows:

18       1.      I am attorney at law duly licensed to practice before all courts of the State of California,

19  and this court.  I am a shareholder with the law firm of Low, Ball & Lynch, attorneys of record for

20  defendant Bay Area Rapid Transit District ("BART") in this matter.  If called upon to testify to the facts

21  contained herein, I could testify competently thereto, based on personal knowledge.

22       2.      Attached as Exhibit A to this declaration are true and correct copies of portions of the

23  deposition of Patricia Nash.

24       3.      Attached as Exhibit B to this declaration are true and correct copies of portions of the

25  deposition of David Sanborn.

26  / / /

27  / / /

28  / / /

-1-

1    I declare under penalty of perjury under the law of the State of California that the foregoing is

2   true and correct.  Executed this 14th day of February, 2008 at San Francisco, California.

3

4                                                              MARK F. HAZELWOOD

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF MARK F. HAZELWOOD IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY,
PARTIAL SUMMARY JUDGMENT

J:\1752\sf0186\Pld\Dec(MFH)MSJ.wpd                                                                          C 05 5307 VRW

# EXHIBIT "A"

1              IN THE UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                         ---o0o---

4

5    PATRICIA NASH,                    )
                                       )
6              Plaintiff,              )
                                       )
7        -vs-                          )     No. CO5 5307-VRW
                                       )
8    BAY AREA RAPID TRANSIT            )
     DISTRICT, DOES 1 - 40,            )
9                                      )
               Defendants.             )
10   _____)

11

12

13

14              DEPOSITION OF PATRICIA NASH

15              Wednesday, November 15, 2006

16

17

18

19   REPORTED BY:  BRIAN DEZZANI, CSR #4572

20

21

22

23              ROOMIAN & ASSOCIATES
                DEPOSITION REPORTERS
24           225 BUSH STREET, SUITE 348
           SAN FRANCISCO, CALIFORNIA  94104
25                 (415) 362-5920

CERTIFIED COPY

1    Q.    And when you say young, how young? When you
2  were in your childhood years?
3    A.    Yeah, when I was in my childhood years.
4    Q.    Okay.
5    A.    And I believe actually I lost light perception
6  during the pregnancies.  That's when I lost the most of
7  it.
8    Q.    All right.  Now, my understanding is that you
9  read Braille; is that correct?
10    A.    Yes, I love Braille.
11    Q.    And did you -- when did you learn to read
12  Braille?
13    A.    When I was six years-old.
14    Q.    And you said that you have taught Braille to
15  students?
16    A.    Yes.
17    Q.    For how long a period of time have you done
18  that?
19    A.    From 1970 -- excuse me.  From 1997 until the
20  last student I had.  His contract ended at the beginning
21  of October.
22    Q.    Of 2006?
23    A.    Yes.  So I don't have a student right now, but
24  I'm looking for some.
25    Q.    What education or training have you had during

1  your life in terms of transportation, going out in

2  public as a blind person?

3      A.    Well, in 1969 I attended the Orientation

4  Center for the Blind, and we had mobility training

5  there.  And then between 1966 and 1968, I also received

6  mobility training in Santa Cruz County with an itinerant

7  mobility instructor.

8          And in -- let's see.

9          Oh, also at California School for the Blind, I

10 received some mobility training in 1963 in my ninth

11 grade year of school.

12         And recently I had some help from two travel

13 instructors through the Title Seven program at the

14 Alliance Blind Center to help me cope with the accident

15 that I experienced in BART, to use BART again and on --

16 and also in -- or 2003, when I was attending college,

17 maybe it was 2002, I'm not sure which year, I had help

18 to learn the campus that I attended, College of Alameda,

19 and also to acquaint myself to South Shore and Park

20 Street, the shops there and everything.

21     Q.    And what courses were you taking at Alameda in

22 2002, 2003?

23     A.    The business administration, medical

24 transcription, medical terminology and creative writing.

25     Q.    Did you get all of the certificates through

```
 1        A.    Yes, the station agent.

 2        Q.    Okay.  Had you ever had any training or

 3   assistance in riding BART before the accident?

 4        A.    No, I didn't need training.  I worked for 10

 5   years in San Francisco, and used BART for eight of those

 6   years everyday of my life, and so I learned it on my

 7   own.

 8        Q.    Were you aware prior to the accident that BART

 9   had educational programs or assistance for blind people

10   to learn about their system?

11        A.    No, I was not, but I wouldn't have felt that I

12   needed any sort of assistance because I was familiar

13   with BART.

14        Q.    Was the assistance that you received in

15   learning the -- the assistance that you received through

16   Sarah and the other person through the Lions Blind

17   Center helpful?

18        A.    Especially with the assistance I received from

19   Sarah was helpful.

20        Q.    How was it helpful?

21        A.    She understood the fear that I felt after the

22   accident about approaching the train, boarding the

23   train, riding the train, being in the station, being on

24   BART at all, and she was very patient with me and

25   observed my technique, and was supportive of me.
```

1      A.    Yeah.  Yeah, I'm not that much closer, but

2    half the distance.

3      Q.    Yeah.  For the last -- so from about 1975 to

4    1982 you took BART everyday to and from work?

5      A.    Yes.  Yes, I did.

6            Is there any water?

7            MR. KASHDAN:  Sure.

8            MR. HAZELWOOD: Q.  Let me go back to your

9    Braille teaching work where you've earned money.  You

10   said you started about June, 2000.

11           What I'd like you to do for me, as best you

12   can, is estimate for me how much you've made in earnings

13   each year.

14     A.    That would be difficult.

15     Q.    Yeah.

16     A.    Because what happens is I began with my --

17   with my counselor, who is my own rehab counselor.  The

18   first student I think she referred to me wasn't until

19   the beginning of 2001.

20     Q.    So really the work started in 2001?

21     A.    Yes, in 2001.

22     Q.    Okay.

23     A.    And that -- most of the contracts would

24   involve about two -- like four to five -- five hours a

25   week, four or five hours a week.  Mostly they were five

```
 1        A.    Well, until I began working in 2001, and

 2    primarily at -- Well, no.  Let's see.  In 2001 I had a

 3    student in San Francisco, I think, or maybe -- oh, I'm

 4    not positive.  Maybe she was -- I got to think, but

 5    between 1994 you said?

 6        Q.    Let's do it this way to make it easier.

 7        A.    Okay.

 8        Q.    Before you started teaching Braille --

 9        A.    Yes.

10        Q.    -- how often did you use BART?

11        A.    Not horribly frequently, just to go to maybe

12    San Francisco or like with the kids or -- not real

13    often.  Maybe once every couple of months or three

14    months or something like that.

15        Q.    Okay.  Did that frequency change when you

16    started teaching Braille to students?

17        A.    Yes.

18        Q.    And how did it change?

19        A.    Well, I had students in Contra Costa County,

20    San Francisco that I needed to see.  One I met at her

21    work in San Francisco, and I met students where it was

22    convenient for them, because some of them are newly

23    blinded so it was necessary that I go to their homes.

24        Q.    Okay.  So from 2001 up until the time of the

25    accident, how often were you using BART?
```

1       A.    Four times, maybe four days a week.

2       Q.    Okay.  And the stations would change with

3    respect to the students changing?

4       A.    Yes.

5       Q.    Okay.  Can you give me kind of a rundown of

6    which stations?

7       A.    Lafayette.

8       Q.    Okay.

9       A.    16th and Mission -- I'm trying to think what

10   was the one that I went to for?  What's her name?

11            Another one in San Francisco -- I think Civic

12   Center.

13      Q.    Okay.

14      A.    I think that's it.

15      Q.    Okay.  Did you use 16th Street at all before

16   you started providing instruction to Richard?

17      A.    No.

18      Q.    Okay.

19      A.    Oh, but my social life increased a lot too as

20   I was starting to teach Braille.  I would go to Hayward

21   and Concord to visit friends every week, like dating and

22   stuff.

23      Q.    Okay.  This was all between 2001 and --

24      A.    2003 -- 2002 and -- yeah.

25      Q.    Okay.  And at any time between when you

1    started working teaching Braille, 2001, and the time of

2    the accident, did you get any instruction in using BART?

3        A.    No.  I think I need to take a break to use --

4             MR. HAZELWOOD:  Let's take five minutes.

5    Absolutely.

6             (Break taken.)

7             MR. HAZELWOOD:  Let's go back on the record.

8        Q.    Ms. Nash, before the accident of August 19th,

9    2004, had you had any accidents or injuries using the

10   BART system before?

11       A.    No.

12       Q.    Before the subject accident, had you ever

13   contacted anyone at BART about any problem that you had

14   using the system?

15       A.    No.

16       Q.    As of August 19, 2004, were you registered or

17   certified to use the East Bay Paratransit or any other

18   paratransit program?

19       A.    Yes.

20       Q.    Okay.  Can you tell me what services you used?

21       A.    East Bay Paratransit.

22       Q.    Okay.  And were you registered with them?

23       A.    Yes.

24       Q.    When did you first become registered with East

25   Bay Paratransit?

1    Q.    If you weren't familiar with the route, then
2    you might use a paratransit service?
3    A.    Yes.
4    Q.    Okay.  All right.  Now, when you -- let's go
5    back to the day of the accident.
6          Were you using any assistive devices on your
7    trip to San Francisco such as your cane?
8    A.    My cane.
9    Q.    Okay.  All right.  And that's a -- how would
10   you describe that cane?  It's a white traditional cane
11   used by people who're sight impaired?
12   A.    Yes, a white cane.
13   Q.    In the -- did you have a guide dog with you
14   that day?
15   A.    No.
16   Q.    In the -- did you have a guide dog at that
17   time?
18   A.    No.
19   Q.    Have you ever had a guide dog?
20   A.    No.
21   Q.    Okay.  When you traveled to San Francisco that
22   morning, were you alone?
23   A.    Yes.
24   Q.    And you told us that the appointment was at
25   8:00 a.m.?

1    A.    Yes.

2    Q.    Did you have any problems using BART to get to

3  the appointment that day?

4    A.    No.

5    Q.    And the appointment was at 9:30 a.m.?

6    A.    Yes.

7    Q.    And you left Richard's residence shortly

8  thereafter?

9    A.    Yes.

10    Q.    And did you walk then back to the 16th Street

11  Station?

12    A.    Yes.

13    Q.    All right.  Now, when you entered the 16th

14  Street Station on your return trip, were you alone?

15    A.    Yes.

16    Q.    Okay.  And were you carrying anything other

17  than your cane?

18    A.    My back -- I was wearing a backpack.

19    Q.    Were you carrying anything else other than the

20  cane?

21    A.    No.

22    Q.    That's okay.

23    A.    That was an extra answer again.

24    Q.    So you just had your backpack and your cane;

25  is that right?

1      Q.   That's your best recollection?

2      A.   Yes.

3      Q.   Okay.  Had you ever used stations agents --

4  this is prior to the accident; had you ever used a

5  station agent to assist you in getting down to a

6  platform or up to a platform at a BART station before?

7      A.   Yes.

8      Q.   How many times had you done that?  Could you

9  estimate that for me?

10     A.   Oh, God.

11     Q.   I know.  A hard one.

12     A.   No.  Just if I weren't familiar with a route.

13     Q.   Okay.  So is it correct that you were aware

14  that a station agent was available to assist you if you

15  needed help?

16     A.   Yes.

17     Q.   Okay.  Again, if you remember, great.  If you

18  don't, that's fine too.

19      Do you happen to remember the name or names of

20  any station agents that had assisted you in the past?

21     A.   No.

22     Q.   Okay.  All right.  So you told us that you

23  took the escalator down to the platform level; correct?

24     A.   Yes.

25     Q.   And is it your recollection that there's only

1    A.    I don't know how to explain that.

2    Q.    Yeah.

3          If you -- okay.

4          Did you stay close to the bottom of the

5    escalator, or did you walk in a certain direction along

6    the platform?

7    A.    You know, I don't remember.  It's been so long

8    since I've been there.

9    Q.    So you don't specifically remember what you

10   did that day in terms of positioning yourself?

11   A.    I believe that I probably walked down the

12   platform some, just so that I would be where a train

13   would be.  I mean, because sometimes the trains are

14   short and you have to know that you're going to be where

15   the train would arrive, but -- yeah.

16   Q.    Okay.  So let's -- this is one of those

17   questions, Ms. Nash, where I don't want to know what you

18   normally do.

19   A.    Okay.

20   Q.    What I want to know is if you specifically

21   recall what you did that day.

22         And do you specifically recall what you did in

23   terms of positioning yourself that day after you got

24   down --

25   A.    No.  No.

1    to position yourself so that you were in a cue area for

2    the doors?

3         A.    Yes, insofar as possible.  I mean --

4         Q.    How did you do that?

5         A.    I was on -- I was positioned on the platform

6    where the train would arrive, so I mean, the -- the door

7    might not be directly in front of me, but I wouldn't

8    have anyway of knowing that --

9         Q.    Okay.

10        A.    -- the train arrived.

11        Q.    Were you aware prior to the accident that

12   there are designated areas on the platform where -- that

13   are marked where the doors -- where the doors will be

14   when the train comes to a stop?

15        A.    No.

16        Q.    Okay.  In essence, there are black markers

17   that interrupt the yellow tag tail edges that are

18   indicators of where the doors will be.  Did you know

19   that before the accident?

20        A.    No.

21        Q.    Okay.  When you had been at BART stations in

22   the past, had you ever asked other passengers if you

23   were in a proper position?

24        A.    Yes.

25        Q.    Okay.  Did you do that on this occasion?

1    A.    I don't recall that.  There were people

2    waiting for the train, but no, I didn't.

3    Q.    Okay.  All right.  So you perceive that the

4    doors opened to your left?

5    A.    M-hmm.

6    Q.    What did you do at that point?

7    A.    I used proper cane technique, and I walked to

8    my left and to find a door opening so that I could board

9    the train.

10   Q.    All right.  Can you tell me how far you walked

11   to your left, how many steps you took?

12   A.    No.

13   Q.    Can you estimate?

14   A.    No.  I mean, I walked to where I thought I

15   perceived the opening to a door.

16   Q.    All right.  And can you tell me from the time

17   that you -- that the doors opened, how many steps you

18   took?

19   A.    No.

20   Q.    Can you give me any estimate in any way?

21   A.    No.  I'm not good -- I'd say maybe -- I don't

22   know how many steps.  I don't know.

23   Q.    Okay.  Can you tell me how far you traveled

24   from your original position to the left?  How far left

25   you traveled?

1   to your left?

2      A.    Yes.

3      Q.    We don't know how far; correct?  And then you

4   were using your cane to tap for the entrance to the

5   doorway?

6      A.    Yes.

7      Q.    All right.  In the past when you had done

8   that, did that have a certain sound or feel when you

9   would tap inside the car?

10     A.    Well, some cars have carpeting and so you can

11  tell right away that you're in a car, and others don't.

12     Q.    Okay.  So what are the other cars, what

13  feeling does that have?

14     A.    Oh, whatever the surface of the car is, I

15  don't know what it is.

16     Q.    Well, would it be metal?

17     A.    It's -- I know what it feels like, but I can't

18  explain it.

19     Q.    Okay.

20     A.    With my cane, I know what it feels like.

21     Q.    Okay.  When you felt that day, did it feel

22  like carpet?

23     A.    No.

24     Q.    Okay.  Did it feel consistent with other train

25  openings that you had on BART in the past?

1    A.    I don't know when -- I don't know when I
2  determined that I wasn't -- that it wasn't a floor
3  surface.
4    Q.    At some point did you determine it was not a
5  floor surface before you fell?
6    A.    No.  Well, I don't think so, because I
7  remember saying, wait.  And that's the last thing I
8  remember.
9    Q.    Who were you saying wait to?
10   A.    To the train.
11   Q.    Okay.  And were you -- were the train doors
12 closing?
13   A.    I don't know.
14   Q.    Were -- okay.  Where were you when you said
15 wait?
16   A.    Between two of the cars.
17   Q.    Had you fallen?
18   A.    No.  I think I was -- probably knew that I was
19 going to or get hit by the train.  One --
20   Q.    Okay.  Again, I'm trying to --
21   A.    One or the other.
22         I was either going to get hit by the train or
23 fall.  I don't know.  I mean, I don't know.  I don't
24 know.
25   Q.    All right.  Is it your recollection that you

1    were saying this as you were in the process of falling?

2        A.    I don't know.

3        Q.    Okay.

4        A.    I just remember saying wait when I was -- I

5    wasn't going to the door of the car.

6        Q.    Okay.  And when you tap, do you tap in a

7    certain regimented way?

8              I mean, do you take to the side and then

9    forward?  I mean, is there some technique that you use?

10             MR. KASHDAN:  You mean as a practice?  Not

11    that particular day?

12             MR. HAZELWOOD:  I'll ask about the practice

13    first, and then ask her if that was what she was doing

14    that day.

15             MR. KASHDAN:  All right.  Okay.

16             THE WITNESS:  Yes.

17             MR. HAZELWOOD: Q.  What's your practice

18    normally?

19        A.    You put your cane out and determine what

20    surface you're feeling or what -- where you are and that

21    -- and then you can go forward.

22        Q.    Okay.  So is this part of that?  Determining

23    what surface you are feeling?

24        A.    Pardon me?

25        Q.    You said that you put your cane out to

 1   determine what surface you are feeling?

 2        A.    Yes.

 3        Q.    All right.  So as part of your normal practice

 4   to determine what surface you are, in fact, feeling?

 5        A.    Well, it's to determine that you're going into

 6   the -- into the door, and I mean, into the train, yes.

 7        Q.    Okay.  And just in terms of the way you do it,

 8   so you tap forward.  Do you tap to the sides also?

 9        A.    Yes.

10        Q.    So tell me you how you do that normally?

11        A.    Just it's -- as though you were walking you

12   move your cane from left to right and -- or from right

13   to left to see what's in front of you.

14        Q.    Okay.

15        A.    And then, of course, you have to -- Well, then

16   -- well, that's it.

17        Q.    Okay.  So you move your cane from left to

18   right in front of you?

19        A.    Yes.

20        Q.    And then you're tapping it on the ground as

21   you're doing so?

22        A.    Yes.  Well, I have a -- I have a cane that

23   rolls.  I have a marshmallow tip.

24        Q.    A marshmallow tip?

25        A.    Yeah.

1     Q.    And why do you have a marshmallow tip?

2     A.    I don't know.  I guess because it's the newest

3  thing and the travel teacher recommended that I have it.

4     Q.    What purpose is having that tip?

5     A.    Well, then you can just roll it and you don't

6  have to pick it up.

7     Q.    And did you have one of these tips at that

8  time?

9     A.    No.

10     Q.    And on the day of accident did you have a

11  marshmallow tip?

12     A.    No.

13     Q.    Okay.  And do you remember then in terms of on

14  the morning of the accident what you were doing -- what

15  your technique you used to try to detect the door

16  opening?

17     A.    I moved my cane from left to right.  I would

18  if I were walking or --

19     Q.    Okay.  And each time that you're moving left

20  to right, are you tapping it on a surface?

21     A.    Yes.

22     Q.    Okay.  And describe for me what you felt or

23  heard as you were doing it -- as you attempted to board

24  the Richmond bound train?

25     A.    I don't know what I felt.  A surface, but I

1    don't know at what point I determined that it wasn't the

2    floor of the car, and that it -- that I was going

3    between the two cars.  I don't know at what point, so I

4    don't -- really, I'm not sure how to answer that.

5         Q.    You knew it wasn't the carpet; correct?

6         A.    Yes.

7         Q.    Okay.  At any point before you fell, did you

8    determine it was not the interior of the car?

9         A.    I just said that I don't know at what point I

10   did, so I can't tell you.  I don't know.

11        Q.    Okay.  All right.  When you -- it's correct

12   that you fell in between two cars; is that your

13   understanding?

14        A.    Yes.

15        Q.    And at that point were you -- what foot was

16   stepping off?

17        A.    I don't know.

18        Q.    Okay.  Are you right-handed or left-handed?

19        A.    I'm right-handed.

20        Q.    And were you carrying your cane with your

21   right hand?

22        A.    Yes.

23        Q.    You want to take a break for a minute?

24        A.    This is really difficult.

25        Q.    Do you want to keep going?

1    cars, and I just lost -- the last thing I remember was,

2    you know, saying wait, you know, like it's sort of

3    futile, but I knew that nobody had probably seen me and

4    that the train was getting ready to leave and that I

5    wasn't going inside of the car.

6         Q.    And what's the next thing you remember?

7         A.    I remember standing up with my hands on the

8    top of the BART track and saying, "Excuse me.  Could

9    somebody please help me?"

10             Because I knew that I had only six more

11   minutes until the next train would arrive.

12        Q.    All right.  Had the -- okay.

13             Again, I just want to -- so you are saying

14   wait, and that was right before -- or somewhere around

15   the time that you were falling; correct?

16        A.    Well, I don't -- I don't remember falling.  I

17   remember -- I mean, I must have known that I wasn't

18   going into the car.

19        Q.    Okay.  When you remember standing up and

20   putting your hands on top of the BART track, had the

21   train already left the station?

22        A.    Yes.

23        Q.    Okay.  So you don't -- is it correct that you

24   don't have any recollection of the train leaving; is

25   that right?

1    A.    No.

2    Q.    Is that correct?

3    A.    Yes.

4    Q.    Okay.

5    A.    But I must have known that because I knew

6   where I was standing.  If another train came, I would

7   probably get killed, or at least I thought I would get

8   hit by the train.

9    Q.    So you had a feeling that you needed to get

10  out of where you were?

11   A.    Yeah.

12   Q.    Okay.  So you put your hands on the top of the

13  BART track?

14   A.    M-hmm.

15   Q.    And then what happened?

16   A.    And I said, "Excuse me.  Could somebody please

17  help me?"

18         And somebody said, "What are you doing down

19  there?  No, we can't."

20   Q.    Do you know who that was?

21   A.    No.

22   Q.    Okay.  And then what happened?

23   A.    Then a lady said, "Don't worry.  We'll get you

24  out of there."

25         Because I know that I had tried to get out,

1    though I don't remember, because my shoes were off, and

2    they were buckled, so I must have struggled to get up.

3         Q.    Okay.  Do you know who that lady was?

4         A.    No, but there were three people who took me

5    out.

6         Q.    And do you know who any of those three people

7    were?

8         A.    No.

9         Q.    Did he they get you up on the platform?

10        A.    Yes.

11        Q.    Do you know -- did you lose consciousness at

12   all?

13        A.    I think so.  Either that -- yes, I think so.

14        Q.    Because you have -- a little bit of gap of

15   time?

16        A.    Yeah.  I mean, I don't remember finding the

17   crawl space or whatever they call the space underneath

18   the platform.

19        Q.    The crawl space you said?

20        A.    Yeah.

21        Q.    Okay.  All right.  So then you got up on the

22   platform, and then what happened?

23        A.    I was lying down and I was bleeding and

24   everything, and --

25        Q.    Where were you bleeding?

EXHIBIT "B"

1                   UNITED STATES DISTRICT COURT

        FOR THE NORTHERN DISTRICT OF CALIFORNIA

2

3

    PATRICIA NASH,

4

                Plaintiff,

5   v.                              No. C 05 5307 VRW

6   BAY AREA RAPID TRANSIT DISTRICT,

7               Defendants.

    _____/

8

9

10

11

                DEPOSITION OF DAVID L. SANBORN

12

                    Thursday, June 7, 2007

13

                    San Francisco, CA

14

15

16

17  Reported By:

18  DEBBIE MAYER, RPR CRR CRP

    California CSR No. 9654

19

20

21  ATKINSON-BAKER, INC.

    180 Montgomery Street, Suite 800

22  San Francisco, CA  94104

    (800) 288-3376

23

24

25  FILE NO.: A104784

1

1       Q.    Do you remember the name of the form?

2       A.    No, I do not.

3       Q.    Where did you ask her to send the form back

4  to?

5       A.    It had an enclosed envelope with it,

6  prestamped, so that -- and actually, Gina said she would

7  make sure it got mailed.

8       Q.    Okay.  Did she mail such a form to BART?

9       A.    I do not know.

10      Q.    Okay.  Okay.  So, back to the first

11 conversation with Ms. Nash, what did she tell you about

12 the accident?

13      A.    It was the day after the accident that I

14 talked to her on the telephone at her home.  She said

15 that she had come down the stairs at 16th Street after

16 some training she was involved in, that she went down

17 the stairs she normally goes down to the platform that

18 she normally uses to go back home, that she did not

19 see -- or contact the station agent.  She did mention

20 that she usually does talk to the station agent, but

21 this time she did not.

22            She went down to her normal spot on the

23 platform waiting for her train.  She heard an

24 announcement that said the next train in was going to be

25 a shorter train, six-car.  She knew she was at a spot

1  that she needed to move further to the north, to the

2  left, to be where that train was going to be, she

3  thought.  She then said that she found out from

4  conversation with the station agent, after she was hurt,

5  that that announcement was for the other platform, that

6  the train she did mean to board was a normal-sized

7  train.  She repositioned herself, she heard the train

8  stop, felt with her cane that she always said she

9  uses -- she doesn't use dogs -- felt for the car doors,

10  side-swiped.

11        She did say that she did not feel for the gap,

12  she did not feel for the floor like she usually does,

13  and she stepped forward and fell in the hole.  As soon

14  as she fell to the trackway, she sensed the heat of the

15  cars and backed away from them, which happened to be

16  back underneath the lip of the platform, and she huddled

17  back in there until she felt the train leave.

18        Then she put her cane up above the platform

19  edge and was waving it and yelling for help, at which

20  time she said someone yelled down to her, and then

21  people came down and helped her back up on the platform,

22  and then helped her medically.  So, that was the whole

23  conversation related to the accident.

24     Q.  Did she describe the train going -- running

25  over her, or going over her?

1    A.   No, she said it "went by" her because she was

2  in the hole.

3    Q.   Right, but did she describe the feeling or

4  anything about what it was like?

5    A.   No, she did not.

6    Q.   Did she indicate that she had lost some memory

7  about that, that she couldn't remember what that was

8  like?

9    A.   No, she did not.  In fact, her -- in both

10  conversations we had about the accident, she related it

11  exactly the same way and did not relate anything

12  about -- she seemed to remember everything that

13  happened, including getting up and talking to the

14  station agent she normally talks to up on the platform.

15  She remembers the ambulance ride, she remembered getting

16  the switches, and she remembered going home.

17    Q.   Did she say why she didn't talk to the station

18  agent that day when she --

19    A.   No, she did not.  I'm sorry.

20         MR. HAZELWOOD:  Take your time.

21         THE WITNESS:  Okay.

22  BY MR. KASHDAN:

23    Q.   Did she say anything about she tried to but

24  couldn't find the agent?

25         MR. HAZELWOOD:  Assumes facts not in evidence.

1   yeah.

2       Q.    But theoretically you could imagine an

3   accident where that could happen?

4       A.    In my investigations of accidents, it's

5   amazing what people can do when they're injured.

6       Q.    But sometimes they can't move?

7       A.    I -- I can't answer that.

8       Q.    Yeah, okay.  When she told you she "did not

9   feel for the floor like she usually does," did she

10  actually have a memory of not feeling for the floor, or

11  she figured that's what had to happen because somehow

12  she fell?

13      A.    By the statements she made in the first phone

14  conversation and second phone conversation, and again at

15  the meeting where I met her at the Task Force, she said,

16  exactly:  "I felt for the doors, I felt the sides, and I

17  forgot to feel for the floor, and I should have felt for

18  the floor."  That was her exact statement.

19      Q.    Okay.  But if you know, if you could tell by

20  any other words she said, could she have been saying

21  that the fact she fell proves that she forgot to do

22  that, or did she really have a distinct memory of

23  forgetting to do that?

24      A.    The way I read her conversation --

25            MR. HAZELWOOD:  Question calls for

1   speculation, but go ahead and if you can.

2        A.   I felt and wrote down in the notes I did make

3   after that conversation is that she forgot to feel for

4   the floor.

5   BY MR. KASHDAN:

6        Q.   Okay.  So you do have notes of this

7   conversation?

8        A.   I put it in a short report that I made after

9   the fact --

10       Q.   Okay.

11       A.   -- after the second conversation.

12       Q.   Did you personally talk to any other BART

13  employees or anyone else who was a witness to any of the

14  events in this accident?

15       A.   Yes, I did.  I talked to the station agent

16  after I received a report from her.

17       Q.   Which one?  There were actually two who

18  submitted reports.

19       A.   I'm trying to remember her name.  I'm sorry, I

20  can't remember her name right now.

21       Q.   That's Stacy Owens or Linda Ramirez?

22       A.   Linda Ramirez.

23       Q.   And this was on a phone call?

24       A.   Yes.

25       Q.   Do you have any notes of that phone call?